[Civ. No. 54265. First Dist., Div. One. Apr. 25, 1984.]

VIRGINIA ARTHUR, Individually and as Administratrix, etc.,
Plaintiff and Appellant, v.
AVON INFLATABLES, LTD., Defendant and Respondent.

NANCY PERRY, Plaintiff and Appellant, v.
AVON INFLATABLES, LTD., Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

\*See *post,* page 408.

## COUNSEL

W. Robert Buxton, Walter R. Allan, Debra L. Zumwalt and Pillsbury, Madison & Sutro for Plaintiffs and Appellants.

Douglas M. Moore, Jr., and Sedgwick, Detert, Moran & Arnold for Defendant and Respondent.

## OPINION

**RACANELLI, P. J.**—On the morning of September 27, 1976, the yacht "Spirit" bound from Hawaii to San Francisco suddenly foundered and sank in heavy seas several hundred miles off the northern California coast.[1] In the few moments before the yacht sank by its stern, the crew—though unable to broadcast an "SOS" from the boat's radio which had been damaged during the violent maneuver—hurriedly collected some clothing and two partially filled water containers while launching two inflatable six-man Avon life rafts. Captain Bruce Collins, crewman Jim Ahola and his girlfriend, passenger Camilla (Cammy) Arthur, boarded raft #9503; crewman Durel Miller and plaintiff Nancy Perry, another passenger, boarded raft #1510. The two rafts remained lashed together for several hours before the line parted and the rafts drifted aimlessly for approximately three weeks until a passing merchant vessel rescued the two survivors in life raft #1510. Nancy, in critical condition, required constant medical attention during the nine-day passage to Japan where she was hospitalized for several weeks. An intensive Coast Guard search resulted in the rescue of Bruce Collins, the lone survivor aboard raft #9503. Several days before Bruce's rescue, Jim and Cammy died (two days apart) from thirst, hunger and exposure and were buried at sea.

---

[1]Although the cause of the sinking has never been determined, it is believed that the yacht collided with a whale.

Plaintiffs Nancy Perry and Virginia Arthur, Cammy's mother, filed separate actions for damages against defendant Avon Inflatables, Ltd., a British corporation, the manufacturer of the life rafts. The consolidated cases were tried on a theory of a defectively designed product. The jury returned a verdict in favor of plaintiff Nancy Perry in the sum of $45,000 and Virginia Arthur in the sum of $75,000.[2]

Thereafter, the trial court granted defendants' motion for a judgment n.o.v. and a conditional motion for a new trial in the event of reversal on appeal. (Code Civ. Proc., § 629.) Plaintiffs appeal both orders.

### I. *Order Granting Judgment N.O.V.*

As noted, the case was tried on the theory of strict liability premised upon a claim that the life rafts manufactured and sold by defendant Avon were defectively designed for the purpose intended. Plaintiffs renew their thesis that the life rafts were defective due to a lack of certain essential survival gear and inadequate raft components and emergency equipment. Plaintiffs' claim relating to the survival gear rests principally upon the lack of an emergency position indicating radio beacon (EPIRB), a battery operated device which continuously transmits a distress signal over a range of 200 miles on frequencies routinely monitored by commercial and military aircraft. In support of its order setting aside the jury verdict, the trial court determined there was no substantial evidence that an EPIRB—if provided—would have properly functioned or that its absence proximately caused Nancy's injuries or Cammy's death.

■ There is no disagreement that injury claims arising on the high seas are to be determined under substantive principles of admiralty law (*Jones v. Bender Welding & Mach. Works, Inc.* (9th Cir. 1978) 581 F.2d 1331, 1337; *Longfellow v. Presidente Miguel Aleman* (1974) 36 Cal.App.3d 508, 512 [111 Cal.Rptr. 643]), while subject to the procedural law, including principles of review, of the state forum. (*Baptiste v. Superior Court* (1980) 106 Cal.App.3d 87, 94 [164 Cal.Rptr. 789], cert. den., 449 U.S. 1124 [67 L.Ed.2d 110, 101 S.Ct. 940]; *Longfellow v. Presidente Miguel Aleman, supra,* 36 Cal.App.3d 508; *Dixon v. Grace Lines, Inc.* (1972) 27 Cal.App.3d 278, 284, 289 [103 Cal.Rptr. 595].) Thus, federal courts have consistently applied section 402A of the Restatement Second of Torts in

---

[2]Plaintiffs received favorable settlements from the owners of the yacht during independent federal proceedings.

assessing strict liability claims based upon a product defect.[3] (*McCune* v. *F. Alioto Fish Co.* (9th Cir. 1979) 597 F.2d 1244, 1252; *Pan-Alaska, etc.* v. *Marine Const. & Design Co.* (9th Cir. 1977) 565 F.2d 1129, 1134.) ▪ Liability is extended whenever the product defect was a proximate cause of the injury complained of (see generally *Swain* v. *Boeing Airplane Company* (2d Cir. 1964) 337 F.2d 940, 942, cert. den., 380 U.S. 951; *Marshall* v. *Ford Motor Company* (10th Cir. 1971) 446 F.2d 712, 715), and a defective condition within the meaning of the Restatement includes a design defect rendering the product dangerous to the user. (*Pennsylvania Glass Sand* v. *Caterpillar Tractor Co.* (3d Cir. 1981) 652 F.2d 1165, 1166-1167; *Pan-Alaska, etc.* v. *Marine Const. & Design Co.*, *supra*, 565 F.2d 1129, 1134.) Moreover, in defining the operative term "product," the nature of the intended use and expected user must be taken into account. (See *LeBouef* v. *Goodyear Tire & Rubber Co.* (5th Cir. 1980) 623 F.2d 985, 988-989.)

Under California law, review of the propriety of a judgment notwithstanding the verdict focuses ultimately on whether substantial evidence exists to support the jury verdict itself. (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158].) ▪ In *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282], the court explained the limits imposed in granting such summary relief and the test to be applied on review in the following manner: "The trial judge's power to grant a judgment notwithstanding the verdict is identical to his power to grant a directed verdict. (*Jones* v. *Evans* (1970) 4 Cal.App.3d 115, 122 [84 Cal.Rptr. 6]; *Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 515 [78 Cal.Rptr. 417, 39 A.L.R.3d 809]; 4 Witkin, Cal. Procedure (2d ed. 1971) § 374, p. 3168.) The trial judge cannot weigh the evidence (*Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 159 [41 Cal.Rptr. 577, 397 P.2d 161]), or judge the credibility of witnesses. (*Knight* v. *Contracting Engineers Co.* (1961) 194 Cal.App.2d 435, 442 [15 Cal.Rptr. 194].) If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. (*McCown* v. *Spencer* (1970) 8 Cal.App.3d 216, 226 [87 Cal.Rptr. 213]; *Hozz* v. *Felder* (1959) 167 Cal.App.2d 197,

---

[3]Restatement Second of Torts section 402A provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

200 [334 P.2d 159].) 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' *Brandenburg* v. *Pac. Gas & Elec. Co.* (1946) 28 Cal.2d 282, 284 [169 P.2d 909].)" (*Id.,* 14 Cal.3d at p. 110; see also *Sprigg* v. *Garcin* (1980) 105 Cal.App.3d 869, 873 [164 Cal.Rptr. 677].) Accordingly, we review the evidence relating to the missing EPIRB and the issue of proximate cause in a light most favorable to the jury verdict.

Avon life rafts #1510 and #9503 were manufactured and sold by defendant Avon in 1969 and 1974, respectively. In July 1975 the owners of the yacht (Mr. & Mrs. Jackson)—in preparation for an extended South Pacific voyage—had raft #1510 repacked, inspected and certified (in compliance with applicable federal regulations) by C. J. Hendry Company, defendant's authorized service station. Both before and after that date, defendant Avon widely promoted the sale of its six-man life rafts in a number of trade and yachting magazines as the "finest emergency liferaft" with "[c]omplete safety equipment [and] full survival and life support equipment" intended for emergency use during ocean cruising. At the time of the tragic episode, neither raft #1510 nor #9503 was equipped with an EPIRB device, although such moderately priced equipment had been available on the retail yachting market since 1973; and a similar portable emergency radio transmitter had been used by the Coast Guard since 1963 in performing rescue operations at sea. A prototype (NARCO) EPIRB, federally licensed for use since 1974, is specifically designed for emergencies at sea: upon being activated, the battery powered device is capable of transmitting an international distress signal continuously for 200 hours over a linear range of approximately 200 miles; the signal can be received by high-flying aircraft within a potential reception area exceeding 125,000 square miles and "locked on" by a receiving aircraft; the replacement cycle for the 13.5 volt battery pack is 18 months from the date of manufacture with a recommended monthly inspection. The dead reckoning (estimated) position at the time of the sinking, as well as the reported positions of the located rafts, were well within a 200 mile range of air lanes used by daily scheduled commercial flights between San Francisco and Hawaii.[4]

The equipment aboard each raft included six pints of water, some cardboard composition flares and a survival instruction card which ultimately proved useless when water soaked. Neither raft contained any food, fishing

---

[4]The plotted rescue positions were about 70 nautical miles apart.

gear nor readily available solar stills usable to desalinize sea water. Lack of an adequate water supply directly contributed to the deaths of Cammy and Jim and the injuries sustained by Nancy.[5] Moreover, the absence of a double inflatable bottom to insulate against temperature change and constant water immersion from leakage, together with a shortage of warm clothing, caused the raft occupants to shiver violently further exacerbating progressive dehydration. Finally, the first aid kit on raft #1510 contained no medication for salt water sores, an additional malaise contributing to loss of body fluids.

Giving to plaintiffs' evidence " '. . . all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence . . . .' " (*Hergenrether* v. *East* (1964) 61 Cal.2d 440, 442 [39 Cal.Rptr. 4, 393 P.2d 164]), it cannot be reasonably concluded as a matter of law that there was no substantial evidence to support the jury's verdict. As a matter of common knowledge, survival at sea involves at best an equation of possibilities. And the probabilities for a successful rescue hinge crucially upon available emergency aids and seaworthy life rafts. As plaintiffs correctly contend, the products here involved were widely heralded as full and complete survival equipment for emergency use during extended ocean cruises. Here, the absence of an emergency transmitter alone could reasonably create an unreasonable risk of harm under governing principles of admiralty law, notwithstanding that defendant Avon did not manufacture the device itself (*Brownlee* v. *Louisville Varnish Co.* (5th Cir. 1981) 641 F.2d 397; *Mahoney* v. *Roper-Wright Manufacturing Company, Inc.* (7th Cir. 1973) 490 F.2d 229, 233) or that the yacht owners failed to add this safety device.[6] (Cf. *Heckman* v. *Federal Press Co.* (3d Cir. 1978) 587 F.2d 612, 616; *Pan-Alaska, etc.* v. *Marine Const. & Design Co., supra,* 565 F.2d 1129, 1136; *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168].) Whether an available EPIRB could have properly functioned and its signal been received by passing aircraft so as to produce at least a chance of successful rescue (cf. *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756, 772 [91 Cal.Rptr. 745, 478 P.2d

---

[5]Bruce, an experienced sailor, subsisted on equal measures of salt water with the rationed water supply. Both Jim and Cammy (who had no experience in blue water sailing) refused the potable mixture and the brackish rain water captured by Bruce through use of the raft's canopy; Bruce had run out of water two days before his rescue. The occupants of raft #1510 were able to supplement their meager rations on the twelfth day adrift by collecting approximately five gallons of rain water.

[6]Although the owners had wisely acquired and packed an EPIRB device in a separate survival kit, the survivors were unable to retrieve that kit before abandoning the sinking yacht. Mrs. Jackson testified they would have packed an EPIRB in raft #1510 had defendant Avon recommended it. It appears that since the "Spirit" tragedy, Avon now recommends optional survival equipment, including EPIRBs, solar stills and air mattresses, in preparing for extended offshore cruising.

465]) presented a factual question on the issue of contributing proximate cause.[7]

Here, though open to some doubt, it cannot be concluded as a matter of law that a transmitted distress signal could not have been successfully monitored. The estimated point of the sinking, as well as the ascertained rescue positions, were within the effective range of reception.[8] Had either raft so equipped been able to transmit a distress signal during the early period adrift, it is at least probable that an alerted air and sea rescue operation would have resulted in the prompt discovery and rescue of all five survivors. Nor can it be said from the record before us that the failure to provide an adequate water supply, or available equipment to convert salt water into fresh water, could not have sustained life or minimized injury from the combined effects of dehydration and exposure. The record tragically demonstrates that life itself hung in the balance of a few days' additional water supply. To paraphrase the language of our Supreme Court, albeit in a different factual context, to require plaintiffs to establish their prima facie case to any greater degree of certainty would simply permit defendants "to gain the advantage of the lack of proof inherent in the lifeguardless situation" which its defective product has created. (See *Haft* v. *Lone Palm Hotel, supra,* 3 Cal.3d 756, 772.)

We conclude that the order granting judgment n.o.v. was erroneous requiring reversal.

## II. *Motion for New Trial**

. . . . . . . . . . . . . . . . . . . . . . .

The order granting judgment notwithstanding the verdict is reversed; the order granting a new trial is affirmed. The parties shall bear their own costs of appeal.

Elkington, J., concurred.

---

[7]We are not persuaded by defendant Avon's contention that life raft manufacturers did not then include EPIRBs as standard equipment, that the batteries could be subject to deterioration and that the distress signal might not have been heard by aircraft. Such evidence merely suggests the obvious: the issue of proximate cause on conflicting evidence is within the province of the factfinder.

[8]At least two of the survivors actually observed an aircraft high overhead within a week of the sinking.

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**HOLMDAHL, J.**—I respectfully dissent. I would affirm the order granting judgment notwithstanding the verdict.

A petition for a rehearing was denied May 25, 1984.